And we'll move to our next argument this morning. It's Jimmy Sugg v. City of Sunrise, Florida. And I see that Ms. Hayes is here. Alexandra Hayes is here for Appellant Sugg. And Jonathan Raley is here for the City of Sunrise. And Ms. Hayes, you may begin with your argument. Thank you, Your Honors. May it please the Court. Alexandra Hayes on behalf of the Appellant, Jimmy Sugg. Mr. Sugg was unlawfully terminated by the City of Sunrise following a massive heart attack that left him permanently disabled and in need of reasonable accommodations. The order dismissing Mr. Sugg's ADA retaliation claim with prejudice must be reversed because Mr. Sugg properly exhausted his administrative remedies on that claim. The order granting summary judgment to the City on Mr. Sugg's ADA discrimination claim must also be reversed because the District Court made improper credibility determinations and improperly viewed the evidence in the light most favorable to the City in determining that no genuine issues of material fact exist for trial. Prior to his heart attack, Mr. Sugg had spent several successful years as the Chief Electrical Inspector for the City of Sunrise, both as a City employee and while on assignment from Broward County. The ultimate decision makers in this case aggressively recruited Mr. Sugg to the City position based on his professionalism, his exemplary customer service, and his leadership abilities. Then in October 2014, Mr. Sugg suffered a heart attack that led to a diagnosis of severe single vessel coronary artery disease. Upon his return to work several weeks later, he immediately informed the decision makers both in person and in writing of his need for reasonable accommodations. Those accommodations were never provided. Instead, shortly thereafter, he was terminated because he was suddenly no longer a good fit for the City. Well, the City says he never requested an accommodation. Was there ever a specific type of specific request that the case law requires? That is the City's position. However, Mr. Sugg's testimony throughout this litigation is that he repeatedly advised his supervisors that because of the many, many physical impacts caused by his single vessel coronary artery disease, he needed accommodations such as not having to drive, not having to walk upstairs, not having to jump over ditches, not having to lift objects, not having to climb, and ideally, wanting to work. He uses the word prefer. I would prefer light duty. What makes that sufficient to constitute a specific request for an accommodation? Under this court's precedent in Hawley v. Clareson Industries, this is more than sufficient. He identified a number of ways that his limitations could be accommodated. And in Hawley, the request was actually much more vague than what Mr. Sugg testifies he asked his supervisors for. And I quote in Hawley, the plaintiff said, it's going to be extremely difficult for me to do this with the problems that I have. There was no clarification as to what this was and what the problems that the plaintiff had. This was enough to put the supervisors in question on notice that the plaintiff had physical limitations resulting from a disability that needed accommodations. Did he have, does the record contain evidence that he had a doctor's note or he had something that made it clear that he could not do the walking, the heavy lifting, the things that you discussed right now? The doctor's note does not specify that. It generally says that he needs light duty assignments, but the case law doesn't require the actual note from the doctor to make those clarifications. The district courts have repeatedly denied summary judgment where the record evidence shows a medical diagnosis such as Sugg's single vessel coronary artery disease supplemented by testimony from the plaintiff himself describing the limitations in question and how they can be accommodated. And that is what- Let me ask you another question regarding reasonable accommodation. Let's assume that we agree that he requested an accommodation. Is the accommodation that he requested a reasonable accommodation given his job? Yes, your honor. Specifically, as it goes to his request to work from home, the BORA regulations that govern the chief electrical inspector position throughout the various municipalities in Florida expressly provides that the chief inspector can work or at job sites as long as he is readily available by phone or email. And in fact, the city granted this accommodation to the subsequent inspector as the entire department was working remotely throughout the COVID-19 pandemic with absolutely no issues. The city concedes that the request to work from home would be reasonable under this regulation and instead takes the position that it had no duty to grant the request because Sugg had the is that if Sugg wanted to work remotely, he would have needed to get approval from his immediate supervisor, Mr. Augustin, who in turn would then need to discuss it with his supervisors, Lubelski and Lay, who are the other two decision makers in this case. Let me ask a question regarding the retaliation claim. What exactly is the protected activity that he was retaliated for? The protected activity under this court's precedent is his request for reasonable accommodations. He advised his supervisors on numerous occasions what his limitations were and how they could be accommodated. Okay, so I'm kind of curious about that because before he came back, my understanding is in the record that he had already been sort of in essence demoted. No, your honor. That was really more of just it was a weird thing that happened where he was listed with BORA. He was supposed to be listed with BORA as the chief electrical inspector. Then while he was on leave, he was removed from that designation. But he was decertified as the chief electrical inspector without notification before he came before he came back and asked for a reasonable accommodation. Correct. But then when he came back to work, he was continuing to work as the chief electrical inspector. It was it was a demotion in name, but not in practice. He continued to show up to work. Was he still a employee at the time? He was still a probationary employee, your honor. But as the human resources director in this case testified, all employees with the city, regardless of their probationary status, their at-will status, their union status are subject to the same progressive disciplinary policy. They are all subject to the same workplace rules. Therefore, the discriminatory and retaliatory conduct in terminating his employment for the supposed workplace issues violates that progressive disciplinary council. Can I go back to the retaliation claim? I want to go back to where Judge Lagoa left off. So Judge Lagoa asked you first, and it's a question that I have as well, what the alleged adverse employment action is. You said it was the failure to give the accommodation after he was notified, correct? No, your honor. The protected activity was his request for accommodation. The Adverse Retaliatory Act is his ultimate termination, which occurred a few months later. Sorry, that's exactly right. So his protected activity, meaning what he was retaliated for, was asking for an accommodation. As I understand the complaint, because remember, with that claim, we're on the motion to dismiss stage, and we only look at the complaint. It's alleged that this happened within two weeks of his heart attack, that his supervisors were aware of his accommodation, and he asked, and he was terminated in February. Right. How is that a plausible allegation of causation at the motion to dismiss stage, where the protected activity was in October-ish of the prior, I think we're talking about 2014, and the termination happens in February of 2015? Isn't that beyond what we've said is sort of presumptively, there's some presumptive causation, because it's only when you're relying on temporal proximity alone to establish causation at the motion to dismiss stage. Here, we have the fact that he did ask for accommodations immediately upon his return to work. He was continuing to request them, and throughout the time that he was back at work, he was continuing to suffer from retaliatory and discriminatory acts. He had several follow-up medics. Except that's not the Adverse Employment Act. In other words, the way that I understand the elements of the statute is, you suffered an adverse employment action because of your disability in a reasonable accommodation claim. It's because of the reasonable accommodation or retaliation because of the protected activity. In this case, the protected activity is having asked for an accommodation in October, November, and the termination is the adverse employment action is there, is in February. How can we say that one is because of the other, where there's at least five months between the two, and he continued to work all that time? Because we have the intervening acts that, while they might not necessarily be actionable adverse actions on their own, you have the denials of the co-workers' offers to grant him time off donations so that he could take paid leave. But counsel, we have case law from this circuit, Higdon versus Jackson, which is a 2004 case that says a lapse of three months between the protected activity and retaliation is too attenuated to satisfy the causation element. By itself, the three-month period does not allow a reasonable inference of a causal relation between the protected expression and the adverse action. I mean, you have to get past that. And here you do have a temporal lapse that I think is a hard or difficult hurdle for you. Right, but that's when you're talking about temporal proximity alone as the causal connection. And here in the intervening time, you have Mr. Suk's co-workers who are trying to donate leave to him so that he can take his follow-up medical appointments, and those requests are being denied. And while that might not be actionable retaliation, it's further evidence of the gap between the initial protected activity, which we contend was not just on one occasion, but had repeated requests made leading up to the time of this termination. I apologize. Does the complaint allege when that happened? I don't think the complaint necessarily makes that clear. But again, this was the... Isn't that problematic? In other words, if it too is in the same February time frame that we're talking about, in other words, as Judge Lagoa said, well beyond the three-month period, how can we then use that as a causal factor? Well, when we're here on appeal, the city is asking for the retaliation claim dismissal to be affirmed with prejudice. If those allegations haven't been sufficiently pled, it would be an abuse of discretion to affirm dismissal with prejudice when Mr. Suk has had no opportunity to correct any sort of pleading deficiencies. Haven't we said that where there's a counsel... Defendant is counseled and has amended once before that it is not an abuse of discretion to dismiss with prejudice? I don't think there's any case law that says just one time. Typically, even when a party... Where it's counseled? We didn't say that in Wagner versus Daewoo, an en banc case written by one member of this panel? I'm not familiar with that case, Your Honor, but the First Amendment was not pursuant to a court order of dismissal. It was a voluntary amendment. And if the court is going to dismiss... Right, in response to a motion to dismiss, in response to a pleading, right? In other words, it wasn't as a matter of course, it was in response to a pleading that was allowed with leave to amend, right? In this case, the First Amendment, I believe, was done as a matter of right, as a matter of course. A motion to dismiss had been filed, but it was never ruled upon. If the court is going... If the district court is going to dismiss based on the sufficiency of the pleadings, then I believe that the case law supports that he should... That Mr. Sugg should have one opportunity to correct the deficiencies pursuant to a court order before dismissal is affirmed with prejudice. Absolutely. As long as he makes a request, right? Right, but that didn't happen in this case because the dismissal was with prejudice and the discrimination claim proceeded. So this is really our first opportunity to challenge the dismissal with prejudice, which is based on... Counsel, that's not 100% true. In the motion to dismiss, it gave us an alternative ground, not just failure to exhaust, but the exact pleading deficiency that we're talking about right now, right? Right. The motion to dismiss argued that, but the district court order of dismissal only... I understand, but no request was made in the response to that argument, was it? I don't... I'm not sure, Your Honor, but I believe we would have requested the opportunity to amend based on the pleading deficiencies, and I believe we should have the opportunity to do so. Thanks, counsel. All right. Thank you, Mackay. We'll hear from Mr. Raley on behalf of the city. Yes. Good morning, and may it please the court. Jonathan Raley for the Akali City of Sunrise. The city respectfully requests that this court affirm the lower court's decisions below in their entirety. With respect to the disability discrimination claim, the lower court properly entered judgment in the city's favor because Mr. Sugg failed to establish a prima facie case of disability discrimination under the ADA. Mr. Sugg was not disabled under the ADA. He never identified a valid comparator, and there was no record evidence sufficient to establish that... Well, let me ask you a question because is there not case law that says that a heart condition is a disability? In and of itself, Your Honor, it is not a disability. The mere presence of a physical impairment such as Mr. Sugg's heart attack and his subsequent diagnosis of a coronary artery disease is not sufficient to establish... But did he not testify in his deposition that he inability to walk? He could only do things in 15-minute spurts. He couldn't do physical lifting, heavy lifting. Aren't those considered major impairments? They are, Your Honor. That was in his deposition testimony provided after his termination from the city. I understand that, but on a motion for summary judgment, the district court and this court has to view those allegations as true. How is that not... Did the district court not, in essence, just disregard that testimony from Mr. Suggs? It did not disregard it, Your Honor. What the district court did is it did view that evidence and it established correctly that Mr. Sugg did not provide adequate evidence regarding timing, frequency, and severity of these alleged impairments. That's what this court set forth in Nunez v. Selig Enterprises in 2020 regarding the necessity to have that type of evidence as part of the record. Here, Mr. Sugg generally contended and testified that he was unable to do certain physical limitations upon his return from his heart attack, but that's as far as he went. He additionally provided light-duty doctor's note. All that said was Mr. Sugg can return to work on light duty. It was no more specific than that. It was three sentences. After the fact, in response to summary judgment, Mr. Sugg submitted two doctor's notes, which the district court properly disregarded and dismissed given that, again, under this court's precedent in Cash v. Smith, the evidence has to be there at the time of the adverse employment action. Your Honors, even if this court were to find that Mr. Sugg was disabled under the ADA, Mr. Sugg can still not establish a prima facie case of discrimination. Does the ADA require comparator testimony? Not specifically, Your Honor, but there are ADA cases such as this court's decision in Payne v. Goodyear Tires, which did consider the comparator evidence. There's no doubt that it could be great causation evidence if you have it, but it's not required. You would agree? The case law does say that any case of intentional disparate treatment, which I believe would apply to both the ADA and Title VII, which is what the McDonnell-Douglas framework, which this circuit has stated unequivocally that McDonnell-Douglas does apply, and as part of that analysis, the comparator evidence- Yes, but anytime we've articulated the elements under McDonnell-Douglas, we have not used the comparator language like we have in the Title VII context, right? In Payne v. Goodyear Tire, it was not a huge analysis. I will concede to that, Your Honor, but it did consider the fact that- No, I understand it can be a consideration. I'm talking about in discussing the elements of the prima facie case under McDonnell-Douglas in an ADA claim, we have never, ever said that the causation element requires a comparator, correct? I have not seen any cases that explicitly require that- So what I just said is correct, right? Yes, sir. Yes, Your Honor. All right. So then the question is, did you make a causation argument other than comparator evidence in your summary judgment below and here on appeal? Yes, Your Honor, and that argument relates to the fact that there is no evidence in the record sufficient to establish a discriminatory motive or animus on the part of any city decision-makers. Show me where in the brief you make a causation argument under the prima facie case for the discrimination claim. Other than the lack of comparator evidence. Understood. If you give me one moment, Your Honor, I'll point you to that. That begins on page 22 of the city's answer brief, where we argue that there's no intentional discrimination by the city's decision-maker, and that goes from page 22 to the top of page 24, which- That was the first sentence of that section there. Even if Sugg identified a viable comparator, the record is devoid of evidence sufficient to establish that the city intentionally discriminated against him on a purported disability. Right. How does that have anything to do with causation? I understand there's no evidence of intentional discrimination. How is that because of disability? In other words, how does that go to the causation element? There still has to be a motive. There still has to be a motive that they considered the alleged disability in the decision. But isn't there, I mean, we're at the motion for summary judgment stage here. And so the allegations have to be accepted as true. And here you have the record evidence contains testimony and record evidence that even before he returned from the hospital, he had been decertified and other actions were taken to impact his position at the city. I mean, why could not a reasonable juror, finder of fact, decide that there was a discriminatory motive? Yeah, sure. And I'll address that in multiple parts. And hopefully I don't forget my multiple reasons. First and foremost, the only adverse employment action here that we've litigated below, and that should be for this course consideration is Mr. Sugg's probationary termination. He was a probationary employee. Yes, he did not. I understand he's a probationary employee, but you still can't terminate a probationary employee for an illegal reason, correct? And more importantly, counsel, I answered Judge Lillo's question, but related to that, I'm looking at the complaint. This is on count one disability discrimination, pages six and seven, that it alleges that they engage in discrimination because of disability, including exactly what Judge Lillo says, stripping plaintiff of the chief electrical inspector position because of his disability, denying a reasonable accommodation, precluding him from benefiting from donated leave, and then discharging him because of his actual perceived disability. Weren't those exactly the things that were litigated below? And where your honor in the city articulated, and I think this answers Judge Lillo's question as well, the city articulated multiple numerous legitimate non-discriminatory reasons for Mr. Sugg's probationary termination that Mr. Sugg failed to establish are pretextual. No, but the point that Judge Lillo is saying is the termination wasn't the only thing that was being litigated here. What was being litigated here was also that he was stripped of his, he appeared to be stripped of his title, also that he was denied leave when other employees were allowed leave as part of the city's policy. There's no adverse employment action, as the record confirms, relating to the alleged stripping of a title. He was never stripped of a title. His certification lapsed upon Mr. Augustine taking over the building official position. Mr. Augustine audited his employees and realized that Mr. Sugg, in addition to one other city employee, certificate were expired. So he instructed them to go to a meeting upon discovery of that information. There was no adverse employment action associated with that because he never lost any rate of pay. He never lost any benefits. He wasn't demoted. I believe we've said losing a title is an adverse employment action, but at the McDonald-Dudless summary judgment stage, isn't it sufficient that almost immediately after he had his heart attack, he was stripped of this title? It just so happened that they did the audit and found the certification. Isn't that a sufficient inference to meet the requirement under McDonald-Dudless? It would be, but the city articulated legitimate non-discriminatory reasons associated with that. So let's get to pretext. Okay. May I ask a question beforehand, Judge Luck? No, please. I just want to understand. My understanding is that other employees were allowed to have donated leave given to them, correct? That is what the testimony was, Your Honor. Yes. And the complaint and the evidence here shows that Mr. Sugg was not allowed to receive donated leave. That is what Mr. Sugg testified to. Correct. And does that not affect his employment status and his wages and benefits? Because then he had to use his own time and therefore was not paid for that time. I believe that his time off request from what the record shows, and I apologize, I don't have a particular pinpoint citation for that, is that he was granted all the time off that he received. So he never did lose any pay. He never lost any benefits. He continued on with proceeding as the chief. And that's, I believe, what the record confirms in this case. I apologize, Judge Luck. Let's get to pretext. Because as I understand it, there were three reasons given. One was his abrasive attitude towards colleagues and a specific incident regarding one particular colleague where they seemed to have some sort of conflict language that was used. And then complaints from outside customers. Sorry, from customer complaints. Thank you. I appreciate you filling that in for me. As I understand it, not only your opposing counsel focused on the facts about his hiring and why he was hired and all the glowing things that one of his supervisors said about him at the time he was hired. But as I understand it, in the months preceding the heart attack, he was even reviewed by one of his supervisors as doing well when it came to customer contact, dealing with colleagues and doing his job well. Does the record support that or not support that? Partially, Your Honor. And I'll address why. So the notion that Mr. Sugg was already being evaluated by the city because he previously worked for Broward County is red herring. He was a county employee. He serviced the city of Sunrise. Correct. He also served other cities in Broward County. He was never a city employee. So he was never formally evaluated. I know, but the counsel, the counsel at summary judgment will review the evidence in the light most favorable to the to the non-moving party in this case to Mr. Sugg. Is it not relevant that for two years he worked at least partially on city matters and that city employees thought he was great and then he was seemed to be fine for five months and then had a heart attack and suddenly he was the worst employee that had ever worked in the history of the city? Well, I would argue that performance can change. And that's what occurred in this case. You know, Mr. Sugg was observed using vulgar and offensive language in the workplace. There were customer complaints about him. And most significantly, he engaged in a significant altercation with a subordinate employee. Well, Mr. Sugg disputes how that. Now, it's interesting that you mentioned that because my understanding of the record is that there was this altercation, but yet nobody was disciplined and there was nothing done. There was no notation made and no one was disciplined. Ms. Lay testified, Your Honor, that she did have a sit down with both of them. So while there was no formal discipline, the matter was not ignored. It was discussed. Mr. Wanamaker and Mr. Sugg dispute as to who was the aggressor. But the bottom line, as applied to this case, Mr. Sugg does not dispute that the incident occurred. He readily acknowledges it. He just disputes that he was the aggressor. The council under city policy, wouldn't there, as I understand it, where there was an altercation like that which was alleged, wouldn't that have led to some sort of progressive discipline under the city's own policies? This is not a progressive discipline case, Your Honor. So I understand that. But what we have to do is look to see if there are any implausibilities, inconsistencies in the proffered reason in the pretext stage. That's the questions that Judge Lagoa is asking and that I'm asking. And so I understand it's not a progressive discipline case. But if the city didn't follow its policies, isn't that an inference that there's an inconsistency in the city's reason such that a reasonable jury could find pretext? Isn't that the issue? No, Your Honor. Well, I understand what your question is, but I would answer you no. And I would refer to the Springer versus Convergy's customer management case. And that case held that an alleged violation of a personnel policy or procedure does not per se establish discrimination. 100% that's true. Of course, that's correct as a matter of law. But that's not the question. The question is, for purposes of deciding pretext, can we say that the fact that the city didn't follow its policies mean that it may not have happened as the city has suggested because it would have otherwise followed its policies? Well, even if you do accept that as evidence of alleged discrimination, which again, we're not saying that it is and most certainly it's not. Mr. Sugg still has to establish that the reasons for terminating him were both false and that discrimination was the real reason. OK, so let's talk about that. As I understand it, there is evidence in the record that that at least one employee told Mr. Suggs that he was fired because of his heart attack. His former supervisor, who had retired from the city, had told them that was the reason and a county high level county official who also had the same prior job that that Mr. Suggs had also said, based on his knowledge that that had been the case. Is that not at least some evidence for the jury to conclude that that the real reason was, in fact, because of his heart attack? No, that that honor, that information cannot be considered on summary judgment because those two individuals, one was a deceased building official and another was a Broward County employee. Those are not the city's decision makers. It is the undisputed record evidence in this case. There's no doubt about it. The question is, is there evidence in the record to suggest that the real reason was that that's what that's the standard you just said, and you're correct in citing it. But if that's the standard, is there not some evidence to suggest that the real reason was, in fact, discrimination? I don't believe there is, Your Honor. And again, he has to establish that each and every reason was false and that discrimination was the real reason. I see that my time is out. There's no further questions. I have a couple more questions. The employees who indicated that the real reason for his termination was his heart attack. You didn't answer that question. That was for those City of Sunrise employees. One of them was he was retired at that time. He is now since deceased. That is Dennis Pustizzi. Mr. Pustizzi, the record shows, had already left the city at the time that Mr. Sugg was terminated. So it's our position that that's purely an opinion from Mr. Pustizzi. Mr. Pustizzi played no part in the decision to terminate because he was not even employed by the city at that time. And the other one was a Broward County employee who testified unequivocally that he played absolutely no role in City Matters because he was not a city employee. All right. So they would have no reason to know why he was terminated. That's correct, Your Honor. All right. And so we asked you about the discrimination claim, but we didn't really talk very much about the retaliation claim. Is my understanding correct that the district judge never reached the merits of whether the complaint stated a cause of action and just dismissed for procedural reasons? That's correct. That is what the district court did. The district court, however, the decision should still be affirmed for one main reason. And I would point this court to the case of Batson versus Salvation Army. The retaliation claim is premised on the failure to accommodate as the protected activity and the termination as the adverse employment action. Those two issues have already been fully litigated in the court below. The record is fully developed on whether the city denied Mr. or whether Mr. Sugg first requested an accommodation, which I didn't touch on that. And I'll rest on the briefs on that, Your Honor, unless you have some further questions for me. But it's our position that he did not ever make a specific identifiable request for accommodation. And even if he did, even if he did, I'm concerned about the retaliation claim. Um, he just failed to check the box, the retaliation box when he filed his charge of discrimination with the EEOC. Is that the basis for the procedural technicality? It was, Your Honor. But as we set forth in our briefs, and again, I rest more fully on the briefs at this point, but the ADA, the retaliation claim as alleged in the charge, and that's the only thing that was exhausted was an alleged failure to accommodate, followed by a termination. That was pled as a failure to accommodate claim in the amended complaint. And that was fully litigated. And the record is fully developed on those issues. So we'd ask that the court can affirm the retaliation claim as well, given that it's been fully litigated. Judge Wilson, can I ask one follow-up question? Thank you. I appreciate it. So back to those three people that we talked about, Judge Wilson asked you about the former employee, the one who has since passed away and the county official. I mentioned a third person, if you recall, and that one seems to have gone unaddressed. That's at docket entry 51-3 at pages 16 and 31 of the record, where Mr. Suggs testified specifically that one of his co-workers told him he better watch his back because they were after him. My co-worker was never identified and was not a decision maker. So I know that hearsay can be admitted or recognized on summary judgment so long as it can be reduced to admissible evidence. But that employee and that alleged statement was never quantified or qualified as to who actually made it. And so that evidence does not establish that the city's decision makers considered Mr. Suggs disability in any way to terminate his prerogative. A co-worker saying that they are after him, meaning they being those who make decisions are after him, isn't it evidence of what decision makers think? No, again, Your Honor, there's no identification of anyone in that testimony. So I don't believe that's sufficient for summary judgment purposes. I'm sorry, Judge Wilson. Thank you. All right. Okay. So I guess the answer to Judge Lutt's question is we don't know who that from the record who the co-worker was. Is that right? That's my understanding of the record, Your Honor.  All right. Okay. Thank you. Thank you, Mr. Riley and Ms. Hayes. You preserved some time for both. Yes, Your Honor. Your Honors, I'd like to address the issue of pretext. The Watermaker incident is a quintessential red herring in this case. The city argued and the district court agreed that Sugg is trying to quarrel with the wisdom of the supervisor's decision. But that is not what our briefs argue. And that's not what the evidence shows. According to this court's presidents in Lewis v. City of Union City, Ritchie v. Industrial Steel, and Morrison v. Booth, departures from normal procedures, such as the city's failure to follow its progressive and its failure to follow its medical accommodations policy, can be indicative of pretext when viewed with other evidence, such as the decision maker's failure to clearly and consistently articulate the reason for Sugg's discharge. At the time he was terminated, he was simply told that they didn't believe he was a good fit for the city anymore. Throughout his employment, no one ever addressed the issues of his purported offensive language or abrasive conduct. In fact, the decision makers in this case all admit that they have similarly used offensive language, that they've heard other employees use offensive language, and they have never been disciplined themselves, nor has anyone else ever been disciplined, even a reprimand or write-up for such language. One of the decision makers in this case, Mr. Augustin, was actually subject to investigation based on coworkers' and customers' complaints about his abrasive conduct, and yet he was never disciplined. The decision makers in this case couldn't point to a single concrete example of Mr. Sugg engaging in this conduct they personally witnessed, nor could they personally recall a single complaint. All that Mr. Lubelski testified was, oh, I think I remember hearing reports about that. That is not sufficient to establish a legitimate reason for his termination. When he was terminated, he was not told that there were customer complaints or that there were abrasive encounters with coworkers or that he used vulgar and offensive language and that he failed to meet the city's performance standards during his probationary period. That wasn't, he was not told about that? No, Mr. Sugg testified all that he was told is that he was no longer a good fit. When it comes to the Wanamaker incident, yes, Mr. Sugg did present conflicting evidence as to what occurred during that meeting, but the evidence that shows that this was merely a pretext for his termination is the fact that the city did nothing to follow up on this incident. The city, as the human resources director testified, has a workplace violence policy that requires immediate termination upon an instance of actual or threatened workplace violence. At the very least, it would require, you know, some sort of leave pending an investigation. Even for a probationary employee? Yes, Your Honor, because as the human resources director testified, all employees, regardless of their probationary status, are subject to the same policies and procedures. And here, following the supposed incident, there was never any sort of write-up. It was never documented. It was never forwarded to HR for review. Instead, Mr. Sugg and Mr. Wanamaker continued to work in close physical proximity, no less than 10 feet apart, because again, the decision makers stated that they did not believe that there was any risk of violence between the two of them. And then suddenly, the day before Mr. Sugg's probationary period was due to end, Leigh and Augustine got together and decided in a 15-minute conversation, he wasn't a good fit. They both testified they could not recall discussing the Wanamaker incident or any other performance issue with specificity in making that determination. And they were never raised with Mr. Sugg prior to him being informed he was no longer a good fit. When this evidence is viewed collectively, it raises a sufficient question of pretext to be decided by the jury. Therefore, we would request that both the district court orders be reversed and remanded for further proceedings. Thank you. Thank you, Ms. Hayes. And thank you, Mr. Reilly. And that completes our docket for this morning. This court will be in recess until 9 o'clock tomorrow morning. Thank you. Thank you. Thank you.